# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

CYNTHIA SANCHEZ,

        Plaintiff,

vs.                                     No. 03cv0854 DJS

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## MEMORANDUM OPINION

This matter is before the Court on Plaintiff's (Sanchez') Motion to Reverse or Remand the Administrative Agency Decision **[Doc. No. 7]**, filed November 20, 2003, and fully briefed on February 3, 2003. On November 12, 2002, the Commissioner of Social Security issued a final decision denying Sanchez' claim for disability insurance benefits. Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds the motion to reverse is well taken and will be GRANTED.

## I. Factual and Procedural Background

Sanchez, now fifty-nine years old (D.O.B. July 31, 1944), filed her application for disability insurance benefits on April 9, 1999. Sanchez has been an individual "closely approaching advanced age" at all times relevant to her claim. Sanchez alleged disability since February 1, 1996 (Tr. 28, 79), due a disabling back impairment. Tr. 18-19. Sanchez has an eleventh grade education (Tr. 527) and past relevant work as a 911 operator and a parking lot attendant. The record indicates Sanchez worked forty hours a week as a 911 operator for the

Enid Police Department in Oklahoma from 1972 to 1989, worked ten hours a day, four days per week as a parking attendant at the Albuquerque airport from 1989 to 1992, and worked forty hours a week as a checker in a grocery store in 1995 for three weeks. Tr. 71. At the administrative hearing, Sanchez testified she quit her job with the Albuquerque airport because it was difficult for her to continue sitting for extended periods of time. Tr. 529. Sanchez also testified she attempted to work in 1995 as a cashier at a grocery store but had to quit because she could not stand and had problems lifting anything heavy when scanning. Tr. 528.

The Commissioner's Administrative Law Judge (ALJ) found Sanchez had to establish disability on or prior to December 31, 1997, the date last insured. Tr. 16. On October 19, 2000, the ALJ denied benefits. Tr. 448. Sanchez filed a Request for Review of the decision by the Appeals Council. On October 18, 2001, the Appeals Council granted Sanchez' request for review and remanded the case to the ALJ on the grounds that: (1) the decision did not contain an adequate evaluation of the treating source opinions, specifically Drs. Lee and Glover; (2) the decision failed to address whether Sanchez had an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the symptoms alleged; and (3) the decision did not contain a function-by-function assessment of Sanchez' ability to do work-related physical and mental activities or sufficient rationale with specific references to evidence of record in support of the assessed limitations. Tr. 466-467.

On remand, the Appeals Council directed the ALJ to: (1) give further consideration to the treating source opinions pursuant to the applicable regulations and explain the weight given to such opinion evidence; (2) evaluate Sanchez' complaints and provide rationale in accordance with the applicable regulations; (3) give further consideration to the claimant's maximum residual

functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations; (4) obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base and to determine if Sanchez had acquired transferable skills; and (5) consider the new evidence submitted to the Appeals Council and issue a new decision. Tr. 467-468.

On November12, 2002, on remand, the ALJ again denied benefits, finding that Sanchez' "spinal disorder" was severe (Tr. 19) but not 'severe' enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. Tr. 28. The ALJ further found that "in spite of the impairment to her lumbar spine," she retained "the residual functional capacity (RFC) for the full range of light work." *Id.* Accordingly, the ALJ found Sanchez was not under a disability from her alleged onset date, February 1, 1996, through the expiration of her insured status. *Id.* As to her credibility, the ALJ found Sanchez' "allegations concerning the intensity, frequency, and persistence of her symptoms and of the extent of her functional limitations during the period under review [were] not wholly credible." *Id.* Sanchez filed a Request for Review of the decision by the Appeals Council. On June 23, 2003, the Appeals Council denied Sanchez' request for review of the ALJ's decision. Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes. Sanchez seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II. Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether he applied correct legal standards. *Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992).

Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994). "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel*, 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989). "[I]n addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996). Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met. *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity. *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)). The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications.

20 C.F.R. § 404.1520 (a-f). The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled. *Thompson*, 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of impairments severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R. §§ 404.1520 and 416.920. At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience. *Id.*

In support of her motion to reverse, Sanchez makes the following arguments: (1) the ALJ erred in finding an absence of radiographic findings; (2) the ALJ erred in his analysis under Listing 1.04– Disorders of the Spine; (3) the ALJ erred in his assessment of her credibility; (4) the ALJ erred in determining that she failed to meet the 12 month durational requirement; (5) the ALJ erred in finding she could do her past relevant work; and (6) the ALJ should have found her disabled based on the Medical-Vocational Guidelines (the grids).

The Commissioner concedes Sanchez "must show that any disability that began prior to December 31, 1997, continued without interruption, through at least April 1998, 12 months prior to her application date." Def's. Resp. at 4. Accordingly, the Court will focus on this time frame. The Court also notes that Sanchez suffered a heart attack in January 1998 and was also diagnosed with Diabetes Mellitus Type II. Subsequently, Sanchez developed fatigue, dyspnea, and diabetic neuropathy. On November 6, 2001, Dr. McGrath also submitted a statement informing the ALJ

that Sanchez could not participate at the administrative hearing due to "a recent stroke." Tr. 509. Thus, at this point, there is no dispute that Sanchez is now disabled. The issue is whether she was disabled due to her back impairment and whether her disability "began prior to December 31, 1997, and continued without interruption, through at least April 1998, 12 months prior to her application date." Def.'s Resp. at 4.

Sanchez contends the ALJ erred in determining there was an absence of radiographic findings and "erred in suggesting that reliance on physician's interpretations of radiographic findings was unacceptable." Pl.'s Mem. Supp. of Mot. to Reverse at 11. Sanchez further argues the ALJ failed to consider all the medical evidence and this impacted on the ALJ's entire analysis and his ultimate decision. *Id.* The Court agrees.

In his decision, the ALJ noted:

> One of the difficulties in assessing the severity of Claimant's back impairment **is the absence in the record of reports of radiographic findings**. There are references in the treatment record to x-rays taken of Claimant's hips in December 1994 and June 1995 (see Ex. 2F at 72), but the reports on those are not in the medical file. Similarly, there is **mention of x-ray findings made in March and November 1995 and a magnetic resonance imaging (MRI) scan in December 1995** (see Exs. 1F at 92-93; and 2F at 9-10 and 67), **but reports drafted in connection with those studies are not in the medical file**. **I have had to depend *entirely* on the *references* made by Claimant's treating physicians to these studies, which apparently revealed abnormalities in her lumbar spine throughout the period under review**. I have given careful consideration as well to Claimant's reports to her doctors concerning her back pain and her physical limitations. I have not, however, viewed these subjective reports of symptoms and limitations as part of the objective medical record. (See Exc. 9E at 3-4).
>
> **Claimant's claim of disability relies almost entirely on her subjective complaints, especially her complaints of debilitating pain.** In evaluating a claim of disabling pain, the appropriate analysis considers (1) whether there is objective medical evidence of a pain producing impairment, (2) whether there is a loose nexus between this objective evidence and the pain, and (3) whether, in light of all the evidence, both objective and subjective, the pain is in fact disabling. Glass v. Shalala, 43 F.3d 1392, 1395 (10th Cir. 1994) (citing Luna v. Bowen, 834 F.2d 161 (10th Cir. 1987). As the summary of the evidence of record below demonstrates, I have considered several factors in determining the credibility of Claimant's subjective complaints:

Tr. 19-20 (emphasis added). The record indicates that on **August 17, 1995**, Sanchez saw Dr. Lee, her primary care physician, for back pain. Tr. 284. Dr. Lee noted, "Has had pain in right hip going down leg for one year, recently pain getting worse, pain now starting on left leg. Had films done 12/94 and about 2 months ago. Complains of pain in sacrum right hip and knee, loses control of bowels and bladder every few days. Numb." *Id.* Dr. Lee performed a physical examination. The objective findings were: bilateral hip films show osteophytes– osteoarthritis; unable to heel or toe walk due to pain. Patellar DTR (deep tendon reflex) brisk, decreased sharp/dull discrimination right mid-thigh to toes; achilles– not elicited, no clonus with dorsiflexion at ankle; right knee– no ligamentous instability, difficulty extending due to pain but is able to flex equal bilaterally, mild muscle wasting bilaterally with tenderness bilaterally (illegible) to patella, along medial and lateral joint line; right hip– traces pain along (illegible) muscle and head of femur. *Id.* Dr. Lee diagnosed Sanchez with lower back pain and hip pain, autonomic dysfunction and right leg neuropathy. Dr. Lee recommended a neurological evaluation and physical therapy. Finally, Dr. Lee prescribed Disalcid 750 mg. one or two tablets four times a day. Disalcid is indicated for relief of the signs and symptoms of rheumatoid arthritis and related rheumatic disorders. *Physicians' Desk Reference* 1656 (53d ed. 1999).

On **September 5, 1995**, Sanchez called Lovelace and spoke to a nurse. Tr. 278. Sanchez complained of severe right lower back pain "where she had surgery before." *Id.* Sanchez described the pain as constant and reported "it hurts to sit, bend, walk and pain radiates down her right leg." *Id.* Sanchez also complained the pain interfered with her sleep at night and reported she had been using a cane to walk. Sanchez reported going to the emergency room on September 1, 1995. The nurse arranged to have Sanchez see Dr. Lee later that day. Sanchez later saw Dr.

Lee and complained that her hip pain was worse. Sanchez had not been able to keep her appointment with the neurologist due to a mix up in her paper work. Lee referred her to a neurologist on that same day at 4:00 p.m. Sanchez was unable to keep her appointment with the neurologist. Tr. 275.

On **November 21, 1995**, Dr. Christian Vom Hueme referred Sanchez for x-rays of her spine due to complaints of incontinence and bilateral leg weakness. Tr. 279. The **x-rays report** indicated: "There is moderate diffuse osteopenia (decreased calcification or density of bone). There is marked narrowing of the L4-5 and L5-S1 spaces, likely unchanged since 3/10/95. There appears to be degenerative facet disease bilaterally at L4-5 and L5-S1. Question laminotomies (an operation on one or more vertebral lamina)." *Id.* (emphasis added).

On **January 17, 1996**, a physician assistant and Dr. Ben Glover, Sanchez' attending physician at the neurosurgery clinic, evaluated her for "progressive worsening of low back pain and pain radiating into the anterior thighs and down below the knees." Tr. 209. Sanchez reported the pain had worsened in the past three months. Sanchez reported most of her pain had been on the right side. Significantly, Sanchez reported it had been difficult for her to walk and to get in and out of chairs. Dr. Glover ordered an MRI and opined the scar tissue at L5-S1 could be the source of her problem.

The physical examination indicated the following:

The patient is very hesitant to get up and walk but **she can barely walk**. She **walks in a slightly flexed position about 10 degrees**. On examination she will f**orward flex to 50 degrees**. She will not extend at all. Right turn is difficult and left turn is difficulty. Deep tendon reflexes are 2+ at the knees as well as at the Achilles and posterior tibial. **She has a positive straight leg raise on the right side at 30 degrees and negative on the right side**. **She has decreased sensation on the right side compared to the left side**. Quad strength is 5/5 bilaterally.

Tr. 209 (emphasis added).  Dr. Glover ordered an epidural block and a lumbosacral corset.  *Id.*

On **January 24, 1996**, a physician at the Lovelace Intervention Pain Center evaluated Sanchez for progressively worsening low back pain.  Tr. 210.  Sanchez reported the pain had continued to get worse the past two months and was constant and "clearly worse with ambulation."  *Id.*  The physician noted Sanchez had some leg and hip pain too.  The physician noted Sanchez wore a brace.

The physical examination indicated Sanchez was obviously having difficulty walking.  The physician noted she had a positive straight leg raise, the neurological exam was intact, there was decreased range of motion, and there was lumbosacral muscle tenderness.  *Id.*  The physician assessed Sanchez as having chronic low back pain, primarily mechanical and muscular and doubted that the L1-2 herniated nucleus pulposus and L3-4 stenosis played much of a role.  The physician also opined the epidural injections would not be helpful.  The physician recommended physical therapy and prescribed a muscle relaxant and Disalcid 750 mg three times a day.  On January 30, 1996, Sanchez received Lortab (an opioid analgesic used to treat moderate to moderately severe pain)) for her pain.  Tr. 211.

On **May 21, 1996**, Dr. Lee examined Sanchez.  Tr. 275.  Sanchez complained of pain in her right hip for the past two years.  Dr. Lee noted Sanchez was unable to internally or externally rotate her right hip. Dr. Lee also referred Sanchez for physical therapy. *Id.*

On **May 23, 1996**, Dr. Lee treated Sanchez for gastritis.  Tr. 273.  Sanchez complained of abdominal pain for six months and described the pain as constant.  Sanchez also complained that her hiatal hernia was causing her problems for the past year but had gotten worse the past six

months.  Sanchez reported abdominal bloating and regurgitation, severe indigestion and vomiting. Dr. Lee prescribed Tagamet 400 mg. twice a day and directed her to return in 7-14 days.

On **June 6, 1996**, Sanchez returned to see Dr. Lee.  Tr. 272.  Sanchez complained of chronic back pain and pain on her right side.  Sanchez reported that she continued to experience indigestion and abdominal pain while on Tagament.  Sanchez also complained of "continued hip pain" and reported she wanted to try a chiropractor.  Dr. Lee diagnosed Sanchez with gastritis and chronic back pain.  Dr. Lee referred Sanchez to the GI (gastrointestinal) clinic and to a chiropractor.

On **August 8, 1996**, Dr. Lee treated Sanchez for a urinary tract infection.  Tr. 274.  Dr. Lee prescribed Septra DS (antibacterial medication).  Dr. Lee instructed Sanchez to return if she continued to have problems.

On **September 21, 1996**, Sanchez returned to see Dr. McGrath.  Tr. 271.  Sanchez complained of abdominal pain in the right lower quadrant, bloating for one day, and diarrhea.  Dr. McGrath diagnosed Sanchez with "abdominal pain, rule out cholelithiasis."  *Id.*  Dr. McGrath ordered an ultrasound of the abdomen and prescribed Percocet two tablets every four hours for pain.

On **October 28, 1996**, a physician assistant and Dr. William Syme, her attending physician, examined Sanchez.  Tr. 208.  The physician's clinical notes indicate Sanchez was admitted to the hospital for abdominal pain and underwent a diagnostic laparotomy. Postoperatively she was diagnosed with pancreatitis (Tr. 190-191).  Sanchez was hospitalized for eleven days.  The physician discharged Sanchez and instructed her to follow-up with her primary care physician.

The record also indicates Sanchez had chest and abdominal x-rays done on **January 22, 1997** (Tr. 236), chest and abdominal x-rays on **March 30, 1997** (Tr. 233-234), chest and abdominal x-rays on **April 2, 1997** (Tr. 231), x-rays of the chest and abdomen and an abdominal ultrasound on **April 14 1997** (Tr. 228), and an abdominal CT scan on **April 16, 1997** (Tr. 226). The clinical notes on these reports indicate Dr. Lee was ruling out bowel obstruction, pancreatitis, and pseudo cysts.

On **October 21, 1997**, Sanchez saw Dr. Lee, her primary care physician, for acute back pain. Tr. 244. Dr. Lee's notes indicate Sanchez had acute back pain for one week which she reported was caused by a sneeze. Sanchez had gone to the emergency room on **October 15th and 19th**, for treatment of the problem and had received pain medications which were "minimally effective." *Id.* Dr. Lee's physical examination indicates Sanchez was in obvious discomfort and had left lower back pain with radiation to her left leg. Dr. Lee also noted pain on extension of her left knee. Dr. Lee recommended pain medication, acupuncture and scheduled her for evaluation at the pain clinic. Id.

On **October 25, 1997**, Sanchez saw Dr. Lee for complaints of "severe back pain, radiating down her left buttock, thigh and to her left foot." Tr. 243. Dr. Lee examined Sanchez and noted, "Pain originates at midline at L4 level– radiates with exquisite tenderness across sacrum, buttocks, lateral thigh and dorsal foot. Walks very stiffly, slowly, with support of her husband. Surgical scar midline lumbar region." *Id.* Dr. Lee diagnosed Sanchez with "Lower Back Pain with Sciatica" and treated her with acupuncture. *Id.*

Sanchez returned to Lovelace Health Systems on **November 3, 1997**, for "acute onset of left leg pain after 'sneezing' about one month ago" and reported the pain was constant but denied

numbness or weakness. Tr. 240. At that time, Sanchez presented in a wheelchair. The physical examination indicated a positive straight-let raise of the left leg at 20 degrees, decreased reflexes of the left leg, and there was diffuse tenderness of the back with poor landmarks. *Id.* The physician noted Sanchez had three lumbar surgeries in the past. The physician diagnosed Sanchez as "left leg pain radicular" and questioned whether she had a herniated nucleus pulposus. The physician ordered a lumbar MRI and prescribed Lortab 7.5 mg. The physician also recommended an epidural steroid injection for the pain. Sanchez opted for the epidural steroid injection and returned two days later for the injection.

On **November 7, 1997**, Sanchez returned to see Dr. Lee. Sanchez complained of back pain and reported the previous treatment had relieved the pain for 1 ½ days and then gradually increased. Tr. 242. Sanchez rated her pain a 10 on a ten- point scaled. Dr. Lee examined Sanchez and noted the pain was localized to the left S1 joint, low lumbar area, left buttock, thigh, ankle, and dorsal foot. *Id.* Dr. Lee treated her with acupuncture.

On **November 14, 1997**, Sanchez saw Dr. Lee with complaints of nausea, vomiting and "motion sickness." Tr. 239. Sanchez reported an acute onset of dizziness since early morning. Dr. Lee diagnosed her with labyrinthitis and vertigo and treated her accordingly.

The record also indicates that on **December 12, 1997**, Dr. Robert Culling referred Sanchez for an MRI of the lumbar spine. Tr. 221-222. The MRI was <u>compared with an MRI dated December 19, 1995</u>, and <u>x-rays dated November 21, 1995</u>. Tr. 221. The December 12, 1997 **MRI report** indicates the following:

> T11-T12: A <u>**small central HNP (herniated nucleus pulposus) is present which that (sic) does not produce more than mild spinal stenosis**</u>. This is probably <u>**unaltered**</u> from before. The facets appear normal.

> **T12-L1:** **A moderate left paracentral HNP, new from before, produces mild to moderate left sided spinal stenosis**. The formina and facet joints appear normal.
>
> **L1-L2:** The **previously identified right paracentral HNP has nearly completely resolved**. No significant foraminal or spinal stenosis is identified. The facets appear essentially normal.
>
> **L2-3:** The disc, foramina, and facets appear normal.
>
> **L3-4:** **A broad based left paracentral and far lateral disc bulge is present**. It does extend into the left sided neural foramen, but is produces only mild foraminal stenosis. It may impinge on the nerve roots below the level of the exiting root, such as the left L4 root which would correlate well with the patient's symptoms. **This finding is somewhat _more pronounced_ than it was _previously_.**
>
> **L4-5:** Mild facet hypertrophy. **A small central disc protrusion is present producing minimal spinal stenosis**. The neural foramina are patent bilaterally.
>
> **L5-S1:** **A circumferential disc bulge is present which may impinge the exiting nerve root on the right. Minimal spinal stenosis is produced by a central disc protrusion. Mild facet hypertrophy is present.**
>
> Impression: **Multi level disc disease as described above**. There are **abnormalities nearly throughout the lumbar spine**. **That which correlates best with the patient's symptoms is that of a left lateral broad based disc bulge at 3-4 which is _more pronounced_ than on the _previous examination_**. Clinical correlation is advised.

Tr. 222. The MRI report confirms that Sanchez had serious back abnormalities since 1995, including herniated nucleus pulposus at different levels of the lumbar spine. Herniated nucleus pulposus is a disorder frequently associated with the impingement of a nerve root. Nerve root compression results in a specific neuro-anatomic distribution of symptoms and signs depending upon the nerve root(s) compromised. *See* Pt. 404, Subpt. P, App.1, Listing 1.00, K (1). Symptoms and signs may consist of the following:

> Pain in the distribution of the compressed root may begin suddenly and severely or insidiously. It is worsened by movement and sometimes by the Valsalva maneuver, coughing, laughing, or straining at stool. Paresthesias or numbness in the sensory distribution of the root may occur, and deep tendon reflexes in the root distribution are depressed or lost. With lumbosacral herniation, staight-leg raises (which stretch the roots) may produce back or leg pain. Muscles supplied by the impaired

> root may become weak, wasted, and flaccid and may show fasciculation
> (involuntary contractions or twitching).

*The Merck Manual* 1489-1490 (17th ed. 1999). Sanchez testified that after the MRI her

physician recommended back surgery. Tr. 540. According to Sanchez, her physician was in the

process of scheduling her surgery when she had a heart attack. Because of the heart attack,

Sanchez' physician had to wait to do the surgery until she recovered from the heart attack. *Id.*

On **February 10, 1998**, Dr. Edward I. Feil, an orthopedic specialist, evaluated Sanchez.

Tr. 446. Dr. Feil's medical notes indicate Sanchez suffered from low back pain and had

undergone three back surgeries; the last operation done in 1990 (L4-5 decompression and disk

removal). Sanchez complained the pain was increasing and described it as constant and

aggravated with lifting, coughing and sneezing. Dr. Feil noted the pain was on the left side of her

back and down her left leg to her big toe with paresthesias in the same distribution. *Id.* Dr. Feil

also noted Sanchez' ability to walk and stand for any length of time was decreased. The physical

examination indicated Sanchez was unable to heel and toe walk due to the pain, could only flex 50

degrees, extend 0 degrees and laterally bend 5 degrees in each direction. Dr. Feil noted slight

weakness of her left quadriceps, decreased sensation of the left leg with involvement of multiple

dermatomes. Straight leg raises caused pain in her back on both sides and she had tight

hamstrings bilaterally. *Id.* Dr. Feil noted that he discussed, "at length," with Sanchez the

following issues: (1) "The chances of any surgery helping her [were] **pretty slim** in that each

time the patient has back surgery the **chance of having a success gets less and less**; (2) Also, she

is certainly not a surgical candidate at this point in time since she is only two weeks post

myocardial infarction, she tells me, and so obviously nothing is going to be done **for at least six months time**." Tr. 246-247 (emphasis added).

On **June 26, 1998**, Sanchez returned to see Dr. Feil. Tr. 504. Dr. Feil noted he had seen Sanchez in February 1998. Dr. Feil's clinical notes indicate the following:

> She has an **L3-4 disc protrusion**. She has been treated conservatively. **She has not gotten better**. She had a recent heart attack at that point in time. She has done well since then. She has also recently been diagnosed as having diabetes which she did not know she had before. She is on 70/30 insulin. She says that her heart has done well. She is not on blood thinner any more. **She says that her pain is getting worse. She cannot live with what she has**. We said to her that since she is diabetic, we want her to get an EMG to make sure that this severe pain that she is having is due to the disc and not diabetic neuropathy. We will go ahead and do this. **She has a positive straight leg raising on her left. She has weakness of her left quadriceps. Her numbness is in her whole leg and does not follow any single dermatome**. The patient needs further work-up to see what is occurring and then we will proceed from that point. Half the time was spent in counseling this patient.

Tr. 504 (emphasis added).

On **July 2, 1998**, Dr. Guggenheim, a neurologist, evaluated Sanchez and performed an EMG. Tr. 502. Dr. Guggenheim noted Sanchez had previously had three back surgeries in 1971, 1982, and 1990. Dr. Guggenheim noted Sanchez had exaggerated pain behaviors, moved slowly, grimaced a great deal and groaned. Sanchez was walking with a cane. Dr. Guggenheim found Sanchez had decreased sensation in the left leg, could not feel position sense in the great toe, felt no vibration, touch was down virtually the entire leg, and reflexes were brief at the knees and she had no left ankle reflex. *Id.* Dr. Guggenheim performed an EMG and **found no evidence of a generalized diabetic neuropathy**. *Id.*

On **July 22, 1998**, Sanchez returned to the orthopedic department with complaints of left leg pain and numbness. Tr. 499. A physician assistant and Dr. Feil evaluated Sanchez. Dr. Feil noted Sanchez had an L3-4 herniated nucleus pulposus with accompanying symptoms which

include left lower extremity pain and numbness over the last year. *Id.* According to Dr. Feil,

conservative treatment had not provided Sanchez relief. Dr. Feil noted:

> Her MRI revealed a moderate left paracentral herniated nucleus pulposus at T12-L1
> resulting in a left-sided spinal stenosis and, in particular, at L3-4 there was a broad-based
> left paracentral and far lateral disc bulge. There was only mild foraminal stenosis on the
> left and it was felt that it might be impinging on the nerve and exiting at that level. At L5-
> S1 there was a disc bulge which may have been impinging as well on that exiting nerve
> root. She had previously considered surgery for this problem but because she had an MI
> (myocardial infarction) in January 1998 she was canceled until this time.

Tr. 499. Dr. Feil noted Sanchez had positive straight leg raises bilaterally, the left being greater

than the right. *Id.* Dr. Feil noted Sanchez was scheduled for a cardiology consultation for "preop

preparation." *Id.* The L3-4 diskectomy was scheduled for August 10, 1998.

On **July 29, 1998**, Sanchez saw a physician assistant and Dr. Feil. Tr. 496. Sanchez was

in a wheelchair and complained of increasing back pain. Sanchez requested a prescription for "her

regular wheelchair at home because she [was] now unable to walk because of the pain." *Id.* Dr.

Feil noted Sanchez had experienced urinary incontinence over the last two to three days. Because

of the urinary incontinence and the "advancing symptoms," Dr. Feil ordered an MRI. The MRI

showed "**advancing of her L3-4 disk as well as increase in the T12-L1 disk protrusion**." *Id.*

(emphasis added).

On **August 10, 1998**, Drs. Robinson and Feil performed an L3-4 diskectomy. Sanchez

tolerated the surgery well and was sent to the recovery room

On **August 24, 1998**, Sanchez returned to see the physician assistant and Dr. Feil. Tr.

493. Sanchez complained of her original symptoms, including pain down her left lower extremity.

However, the pain and numbness were not as severe. Dr. Feil advised Sanchez that "**since the**

**symptoms had been occurring for over a year prior to her surgery that it was not probable that the symptoms would resolve that quickly**." *Id.*

On **September 11, 1998**, Dr. Feil evaluated Sanchez. Tr. 492. Sanchez reported she had "bad pain" over her greater trochanter on the right. Dr. Feil's examination indicated tenderness over this area. Because Sanchez could not take anti-inflammatories due to her stomach problems, Dr. Feil injected the areas with cortisone.

On **October 23, 1998**, Sanchez returned to see Dr. Feil. Tr. 491. Sanchez continued to have pain in the trochanteric area. Dr. Feil ordered physical therapy.[1]

The foregoing medical records support Sanchez' contention that the ALJ failed to consider all the medical evidence and this impacted on the ALJ's entire analysis and his ultimate decision. The ALJ failed to consider the **November 21, 1995** x-rays of her spine and the **December 12, 1997** MRI of the lumbar spine which clearly document her serious back problems. The ALJ also failed to consider Sanchez' treating physician's opinion. For example, the ALJ noted in his decision:

> On August 17, 1995, Claimant complained to her primary care physician, Lonnie Lee, M.D., that she was having pain in her sacrum and right hip, going down into her right leg into her knee, also with numbness in her right leg. She told Dr. Lee that she had experienced this pain for the preceding year, but that the pain had recently gotten worse and was starting in her left leg as well as the right. She also indicated that she was losing bladder and bowel control every few days. On examination, Claimant was unable to heel or toe walk due to the pain. Dr. Lee's notes indicate that x-ray showed osteophytes and evidence of osteoarthritis in both hips. He did not, however, diagnose a degenerative condition. He diagnosed low back and hip pain, autonomic dysfunction, and right leg neuropathy. **It is not clear what signs or findings were relied upon to make these**

---

[1] The rest of the medical record addresses Sanchez' myocardial infarction, her diabetes, pancreatitis, and elevated lipids. Most of these medical records are from her cardiologist and endocrinologist or emergency room physicians who treated Sanchez during acute pancreatitis or chest pain.

**diagnoses, except Claimant's subjective complaints**. Claimant was referred for neurological evaluation and then physical therapy, but did not follow through on either recommendation. (Ex. 2F at 72; *see* Exs. 1F at 92-93; and 2F at 64). **Claimant relies on her subjective complaints recorded at this time to support her argument that her back condition was severe starting in August 1995.** (Ex. 9E at 4). However, her failure to follow her doctor's treatment recommendations suggests that Claimant's symptoms subsided, at least until the next time she saw Dr. Lee, on September 5, 1995. Again, she complained of severe pain in her right lower back, "where I had surgery before." (Ex. 2F at 66). She said that she was in constant pain, but she indicated that that pain had started *only two days before*. (Compare Ex. 2F at 72). At this time, she again complained of pain radiating down her right leg. She was walking with a cane and said that she experienced the pain the pain with sitting, bending, and walking. (Ex. 2F at 66). I do not find any prescription in Claimant's record for a cane or any of the other assistive devices she used at various times throughout the period under review. Nor do I find any note in her medical record indicating that any of Claimant's medical caregivers recommended the use of an assistive device. X-rays taken some time in the Fall of 1995 revealed moderate diffuse osteopenia and marked narrowing of the L4-5 and L5-S1 disc spaces, but Dr. Lee noted that these findings were "likely unchanged" since March of 1995. He does not repeat the diagnoses recorded at the time of Claimant's August 1995 visit. In September 1995, Dr. Lee concluded that Claimant's complaints were probably attributable to degenerative facet disease, bilaterally at L4-5 and L5-S1. (Ex. 2F at 67).

Tr. 20 (emphasis added). The ALJ questioned how Dr. Lee arrived at her diagnoses on **August 17, 1995**, and opined Dr. Lee based her diagnoses on Sanchez' subjective complaints. The record does not support the ALJ's conclusion. "In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his ... own credibility judgments, speculation or lay opinion." *McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir.2002) (quotations and italics omitted). Moreover, an ALJ may not substitute his own opinion for medical opinion. *See Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 744 (10th Cir. 1993).

It is clear from the record that Dr. Lee performed a physical examination and documented her objective findings. As already noted, Dr. Lee's objective findings were: bilateral hip films show osteophytes– osteoarthritis; unable to heel or toe walk due to pain. Patellar DTR (deep

tendon reflex) brisk, decreased sharp/dull discrimination right mid-thigh to toes; achilles– not elicited, no clonus with dorsiflexion at ankle; right knee– no ligamentous instability, difficulty extending due to pain but is able to flex equal bilaterally, mild muscle wasting bilaterally with tenderness bilaterally (illegible) to patella, along medial and lateral joint line; right hip– traces pain along (illegible) muscle and head of femur. Tr. 284. The physical examination indicated decreased and absent reflexes, decreased sensation, and muscle wasting. These findings support Dr. Lee's diagnoses of lower back pain and hip pain, autonomic dysfunction and right leg neuropathy.

Shortly thereafter, on **September 5, 1995**, Sanchez complained of severe right lower back pain "where she had surgery before." Tr. 278. Sanchez described the pain as constant and reported "it hurts to sit, bend, walk and pain radiates down her right leg." *Id.* Questioning Sanchez' credibility, the ALJ focused on Sanchez' use of a cane and noted there was no evidence in the record that her" medical caregivers recommended the use of an assistive device." Tr. 20. Yet, this visit confirms Sanchez' complaints of severe pain. Moreover, Sanchez had endured multiple back surgeries at this point, and it was very probable that a cane had previously been recommended. Additionally, Sanchez' back impairment was documented by the November 21, 1995 x-rays and the December 1995 MRI. *See* Tr. 221-222.

The ALJ's finding that "claimants claim of disability relies almost entirely on her subjective complaints, especially her complaints of debilitating pain," also is not supported by the record. While it is true that this Court generally defers to credibility determinations of the ALJ, such deference is not absolute. *Thompson*, 987 F.2d at 1490. In this case the ALJ's credibility determination is suspect based on his finding that her claim of disability relied almost entirely on

her subjective complaints.  Contrary to this finding, <u>objective medical evidence</u>, including lumbar

x-rays and MRIs confirm Sanchez' serious back impairment as far back as August 1995.

Additionally, the record supports Sanchez' contention that she met Listing 1.04 which

states:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine). **or**
>
> B.  Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; **or**
>
> C.  Lumbar spinal stenosis resulting in pseudo-claudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

Pt. 404, Subpt. P, App. 1, Listing 1.04.  The November 21, 1995 lumbar spine x-rays indicate

Sanchez had narrowing of the L4-5 and L5-S1 disc spaces and degenerative facet disease

bilaterally at L4-5 and L5-S1.  The December 1995 MRI indicates Sanchez had L1-2 new

herniated nucleus pulposus and L3-4 mild stenosis.  Tr. 210.  The December 1997 MRI indicates

Sanchez had multi-level disc disease with abnormalities throughout the lumbar spine, specifically a

central herniated nucleus pulposus at T11 -12 with mild spinal stenosis, a moderate left

paracentral herniated nucleus pulposus with mild to moderate spinal stenosis, a broad based left

paracentral and far lateral disc bulge at L3-4, mild facet hypertrophy at L4-5 with a small central

disc protrusion, and a circumferential disc bulge and spinal stenosis by a central disc protrusion and mild facet hypertrophy at L5-S1.  Tr. 222.  Accordingly, Sanchez has established she met the initial criteria of Listing 1.04.

Sanchez also meets the "A criteria" of the listing.  The medical record indicates Sanchez suffered from nerve root compression as evidenced by her treating physicians' clinical notes setting forth her limitation of motion of the spine (Tr. 244, 240, 446, 504), motor loss (Tr. 284, 279, 242, 446, 499, 504), sensory and reflex loss (Tr. 284, 279, 240, 446), and positive straight-leg raising (Tr. 284, 244, 243, 240, 446, 499, 504 ).  Accordingly, the Court finds Sanchez met the criteria of Listing 1.04(A) and is presumed disabled without considering age, education and work experience.  20 C.F.R. § 404.1520(d).

Finally, Sanchez has met her burden to show that her disability due to her back impairment began prior to December 31, 1997, and continued without interruption through August 24, 1998, the date of her first visit to Dr. Feil after her back surgery.   Moreover, the record fully supports a determination that Sanchez is disabled as a matter of law and is entitled to benefits.  Accordingly, the Court finds the ALJ's finding that is not disabled is not supported by substantial evidence and is contrary to law.  Because "[f]urther administrative proceedings would only further delay the appropriate determination and award of benefits," *Dixon v. Heckler*, 811 F.2d 506, 511 (10th Cir. 1987), the case is remanded for the immediate calculation and award of benefits.

**Conclusion**

The Court's review of the ALJ's decision, the record, and the applicable law indicates the ALJ's decision does not adhere to applicable legal standards and is not supported by substantial evidence. The ALJ's finding that Sanchez was not disabled prior to her date last insured is not supported by substantial evidence. Accordingly, the decision of the ALJ is reversed and remanded to the Commissioner for an immediate award of benefits.

A judgment in accordance with this Memorandum Opinion will be entered.

_____
**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**